RAILWAY LABOR EXECUTIVES'
ASSOCIATION, et al., Plaintiffs,

v.

NATIONAL RAILROAD PASSENGER
CORPORATION, Defendant.

Civ. A. No. 86–1235.

United States District Court,
District of Columbia.

Aug. 3, 1988.

Lawrence M. Mann, Alper & Mann, Washington, D.C., for plaintiffs.

Robert A. McCullough, Sally D. Garr, Assoc. Gen. Counsel, Nat. R.R. Passenger Corp., Washington, D.C., for defendant.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

The issue in this case is whether Amtrak's unilateral imposition of drug testing on its employees gives rise to a "minor" dispute under the Railway Labor Act over which this Court lacks subject matter jurisdiction or to a "major" dispute entitling the parties to an injunction maintaining the status quo while they bargain over the change.

The Court finds that drug testing is a substantial change in the employees' terms and conditions of employment not arguably predicated on an existing agreement and shall issue the injunction sought by plaintiffs. The case is before the Court on cross-motions for summary judgment. The Court finds that no genuine issues of material fact remain for trial and plaintiffs are entitled to summary judgment as a matter of law pursuant to Fed.R.Civ.P. 56.

### Background

The Railway Labor Executives' Association, which is an association of railway labor unions, and a number of unions representing railway workers (collectively "the unions") have sued the National Railroad Passenger Corporation (Amtrak), a private entity created by Congress in 1972 to provide intercity rail passenger service.

▮ The collective bargaining contracts between the unions and Amtrak are silent on drug testing, physical examinations, and the use of alcohol or drugs. However, agreements include not only express terms, but terms implied by well-established past practice and by law. *See Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union*, 396 U.S. 142, 153–54, 90 S.Ct. 294, 301, 24 L.Ed.2d 325 (1969). Amtrak contends past practice provides a basis for drug testing of its employees.

For a number of years, Amtrak has required physical examinations of its employees. These examinations are conducted before an employee is hired, when an employee returns to work from a non-vacation absence of more than 30 days, and, for employees covered by the Hours of Service Act, 45 U.S.C. §§ 61–66 (1982),[1] periodical-

---

1. The Hours of Service Act covers employees who operate trains, handle train orders and other instructions regarding train movements, and construct, maintain, or repair signal systems. The Act does not cover supervisory employees, maintenance of way and car force employees, and members of other non-operating crafts.

ly.[2] The medical standards and tests administered in these physical examinations have changed from time to time with medical developments, and Amtrak asserts that it has become established practice for the railroad to unilaterally make such changes.

Since the mid–1970s, the physical examinations have routinely included urinalysis, although a drug screen was not initially part of the urinalysis. A drug screen was performed only when, in the judgment of the examining physician, the employee may have been using drugs. In April, 1983, Amtrak began requiring a drug screen as part of the urinalysis in pre-employment and return-to-work physical examinations. In July, 1985, Amtrak began requiring a drug screen as part of every mandatory physical examination, including periodic physicals.

Amtrak also requires urinalysis drug screening outside the context of a medical examination when there exists reasonable suspicion that an employee may be under the influence of alcohol or a drug. The record suggests the railroad began testing based on reasonable suspicion less than a year before this lawsuit was filed; previously, the railroad relied on supervisory observation to detect drug or alcohol impairment.

A rule of conduct, unilaterally implemented by the railroad, prohibits on-duty employees from working while under the influence of alcohol or drugs. That provision, asserted by Amtrak without contradiction by the unions to be long-standing, was known in prior years as Rule C and stated as follows:

> Reporting for work under the influence of alcoholic beverages or narcotics, or the use of alcoholic beverages while on

or subject to duty or on Company property is prohibited.

In early 1985, Amtrak revised the rule, now designated as Rule G, to state as follows:

> Employees subject to duty, reporting for duty, or while on duty, are prohibited from possessing, using, or being under the influence of alcoholic beverages, intoxicants, narcotics or other mood changing substances, including medication whose use may cause drowsiness or impair the employee's responsiveness.

On April 15, 1986, Amtrak issued a 12–page document detailing its policy and procedure for drug and alcohol testing of employees covered by the Hours of Service Act. On January 1, 1987, the railroad issued a similar document for employees not covered by the Hours of Service Act. Amtrak characterizes the documents as "modifications and codifications of Amtrak's pre-existing policies and practices."

The main difference in the two documents concerns post-accident testing, which is authorized for employees covered by the Hours of Service Act.[3] The documents state that an employee who tests positive for drugs or alcohol is subject to discipline and shall not be allowed to work until testing negative. An employee who tests positive three times in a row is subject to dismissal.

In a separate notice to employees covered by the Hours of Service Act, Amtrak warned that the urine test may detect off-duty drug use, without any on-the-job impairment, for up to 60 days. Unless the employee demands a blood test, a positive urinalysis "will support a presumption that you were impaired at the time the sample was taken." [4]

---

**2.** Locomotive engineers must undergo physical examinations annually. Others covered by the Hours of Service Act must be examined every three years up to age 55, every two years up to age 69, and annually thereafter.

**3.** The Federal Railroad Administration regulation requiring mandating post-accident blood and urine tests has been held to violate the Fourth Amendment. *Railway Labor Executives' Association v. Burnley,* 839 F.2d 575 (9th Cir.), *cert. granted,* —— U.S. ——, 108 S.Ct. 2033, 100

L.Ed.2d 618 (1988). The Ninth Circuit addressed the constitutionality of the government's *requiring* post-accident testing, of course, not the legality of the railroad imposing such testing unilaterally.

**4.** On August 15, 1987, while this lawsuit was pending, Amtrak revised its policy and advised employees that blood test results would no longer be relevant in a Rule G case because "Amtrak considers the mere presence of a drug in an employee's system as a violation of Amtrak Rule

The first grievance concerning Amtrak's modifications of its drug testing procedures was filed in April, 1986, by the Brotherhood of Maintenance of Way Employees, a plaintiff here. A number of similar grievances are now pending. This lawsuit was filed on May 2, 1986.[5]

The unions contend drug testing is not arguably justified by the established past practices relating to physical examinations and the prohibition against on-duty use of drugs or alcohol. Amtrak urges a much broader finding of what is implicit in the agreements between the railroad and the unions:

> Amtrak has had a long-standing and established practice of unilaterally: (1) developing and implementing comprehensive medical fitness standards and programs, including mandatory physical examinations and tests; (2) requiring urinalysis as part of all mandatory physical examinations; (3) requiring drug testing as a part of these urinalysis procedures; (4) revising or changing its medical standards including the battery of tests used in those mandatory physical examinations; (5) developing and implementing medical standards and policies, including revisions and expansions of its Rules of Conduct such as Rule G; and (6) developing and implementing a comprehensive drug and alcohol rehabilitative program (EAP) [Employee Assistance Program].

Defendant's Opposition to Plaintiffs' Motion for Summary Judgment at 17 (footnote omitted).

■ It is a question of fact whether a practice or custom has become part of the contract by implication through long-standing observance or acquiescence of the parties. *See, e.g., Brotherhood of Locomotive Engineers v. Burlington Northern Railroad Co.,* 838 F.2d 1087, 1091 (9th Cir. 1988), *petition for cert. filed,* 56 U.S.L.W. 3720 (U.S. Apr. 1, 1988) (No. 87–1631); *Railway Labor Executives' Association v. Norfolk & Western Railway Co.,* 833 F.2d 700, 705–06 (7th Cir.1987). The Supreme Court has framed the inquiry as whether the practice has "occurred for a sufficient period of time with the knowledge and acquiescence of the employees to become in reality a part of the actual working conditions." *Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union,* 396 U.S. 142, 154, 90 S.Ct. 294, 301, 24 L.Ed.2d 325 (1969). The Eighth Circuit has stated that a "long-standing practice" should be considered part of the agreement when it "ripens into an established and recognized custom between the parties." *Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington Northern Railroad Co.,* 802 F.2d 1016, 1022 (8th Cir.1986).

■ In this case, the Court cannot find that Amtrak's practice of requiring drug testing, either in physical examinations or based on reasonable suspicion, has occurred for a sufficient period of time, with the knowledge and acquiescence of the unions, to become part of the agreement itself. The record does not reflect when Amtrak began testing based on reasonable suspicion, which precludes a finding that the practice was longstanding and established before the unions challenged the

G. Hence, the objective of Amtrak's Drug/Alcohol Testing Program is not to determine influence, but to determine whether or not a prohibited substance is present in an employee's system." Amtrak Washington Division Notice 4–25 (Aug. 13, 1987), Exh. 1 to Plaintiffs' Reply to Defendant's Motion for Summary Judgment. In other words, it no longer matters to the railroad whether an employee is under the influence of a drug or impaired in any way; clearly, Amtrak has imposed a disciplinary rule based on employee's off-duty conduct, a departure from past practice that in itself has been held to constitute a major dispute. *See Brother-*

*hood of Maintenance of Way Employees v. Chicago & North Western Transportation Co.,* 827 F.2d 330 (8th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1291, 99 L.Ed.2d 502 (1988); *International Association of Machinists & Aerospace Workers v. Trans World Airlines,* 686 F.Supp. 930, 940 (D.D.C.1988).

5. Amtrak contends this lawsuit is barred by the statute of limitations. Even assuming, *arguendo,* that a major dispute is subject to a statute of limitation, the defense must fail because the record does not establish when the plaintiffs were notified of the changes being litigated.

practice in April and May, 1986.[6] Drug testing was not required in pre-employment and return-to-work physical examinations until April, 1983, and in periodic physical examinations until July, 1985. At the most, routine drug testing was required for three years before the unions objected formally; in the case of periodic physical, the unions objected after nine months. This is not the length of time required for a practice to become so "long-standing" and "established" that it ripens into an implied working condition and an implied part of the collective bargaining agreement.

On the other hand, the Court finds that routine medical examinations and the rule against use of drugs or alcohol on duty are so well-established and long-standing as to be an implied working condition.

### Discussion

Relations between the unions and Amtrak are governed by the Railway Labor Act ("the Act"), 45 U.S.C. §§ 151–188 (1982). The Act is designed to provide for the prompt and orderly settlement of both fundamental contractual disputes and of grievances between the unions and management, to avoid the disruption of commerce caused by strikes or other means of self-help by either side. *Id.* § 151a. The Act imposes on both the unions and the railroad a duty to negotiate whenever a dispute arises. *Id.* § 152 First, Second. Beyond the initial stages of negotiation, the Act treats "major" and "minor" disputes differently.

The terms "major dispute" and "minor dispute" are not found in the Act, but have been supplied by the case laws. The Act speaks of "changes in agreements affecting rates of pay, rules, or working conditions," *id.* § 156, as one kind of dispute, and of "disputes ... growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions," *id.*

§ 153 First (i), as another. The accepted distinction between major and minor disputes is found in *Elgin, Joliet & Eastern Railway Co. v. Burley,* 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945), where the Supreme Court said major disputes are those arising

over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertions of rights claimed to have vested in the past.

*Id.* at 723, 65 S.Ct. at 1290.

A minor dispute, on the other hand,

contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case.... [T]he claim is to rights accrued, not merely to have new ones created for the future.

*Id.*

Major changes in the relationship between employees and the railroad may not be implemented unilaterally. For a major dispute, involving a change in the rates of pay, rules, or working conditions in a way not contemplated by the collective bargaining agreement, the parties must provide notice of the intended change and attempt to resolve it through negotiation, mediation, and possible presidential intervention. If a major dispute cannot be resolved, the union can strike in support of its position. *Railway Labor Executives' Association v. Norfolk & Western Railway Co.,* 833 F.2d 700, 704 (7th Cir.1987);

---

6. In their Memorandum in Response to Plaintiffs' Supplemental Submissions, filed July 27, 1988, Amtrak's attorneys state that reasonable suspicion drug testing began "shortly after" Rule G was promulgated in 1985. However, the affidavit cited does not provide any date for the introduction of reasonable suspicion testing. At any rate, testing based on reasonable suspicion cannot be considered a "long-standing" or "established" practice if it began in 1985, the year before the practice was challenged in this lawsuit.

*see* 45 U.S.C. § 156. In a minor dispute, on the other hand, minor changes in working conditions may be implemented unilaterally while settlement is sought through arbitration before the National Railroad Adjustment Board (NRAB). *See id.* § 153. A minor dispute cannot be the subject of a strike.

██ The question of whether a dispute is major or minor determines the extent to which a federal court may become involved. If the dispute is major, the courts have broad powers to enjoin unilateral action by either side to preserve the status quo while statutory settlement procedures go forward. Such an injunction may issue without regard to the usual balancing of the equities. If the dispute is only minor, the court's power is more limited since the NRAB has exclusive jurisdiction over minor disputes. The traditional power to enjoin under equitable principles remains, but injunctive relief is usually inappropriate because irreparable loss and inadequacy of the legal remedy cannot plainly be shown until the NRAB has had an opportunity to act.[7] *See Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington Northern Railroad Co.*, 802 F.2d 1016, 1021–22 (8th Cir.1986).

Whether a dispute is major or minor depends on whether it is arguably comprehended within the agreement of the parties. As an initial step, the Court must determine what that agreement is. This factual inquiry has been completed here.

██ The test in this Circuit for determining whether a dispute involves only the interpretation or application of an existing agreement (and is therefore minor) or involves the formation of a collective agreement or a unilateral effort to change working conditions (and is therefore major) was established in *Southern Railway Co. v. Brotherhood of Locomotive Firemen & Enginemen*, 384 F.2d 323 (D.C.Cir.1967):

> [W]here the railroad asserts a defense based on the terms of the existing collective bargaining agreement, the controversy may not be termed a "major" dispute unless the claimed defense is so obviously insubstantial as to warrant the inference that it is raised with intent to circumvent the procedures prescribed by § 6 [45 U.S.C. § 156] for alteration of existing agreements.

*Id.* at 327. "Only if ... the contract were not reasonably susceptible to the carrier's contention would this be a § 6 dispute proper for a 'status quo' injunction." *International Brotherhood of Electrical Workers v. Washington Terminal Co.*, 473 F.2d 1156, 1173 (D.C.Cir.1972) (emphasis omitted) (quoting *United Transportation Union v. Burlington Northern, Inc.*, 458 F.2d 354, 357 (8th Cir.1972) (footnote omitted)), *cert. denied*, 411 U.S. 906, 93 S.Ct. 1530, 36 L.Ed.2d 195 (1973). "But where the position of one or both of the parties is expressly and arguably predicated on the terms of the agreement, as illuminated by long-standing practices, the question of whether the position is well taken involves a minor dispute." *Id.* at 1172 (emphasis omitted) (quoting *Switchmen's Union v. Southern Pacific Co.*, 398 F.2d 443, 447 (9th Cir.1968)). Other circuits use different formulations,[8] but the result is the same:

---

7. The unions sought injunctive relief even if the Court found the dispute to be minor. This request is mooted by the Court's conclusion that the dispute is major.

8. *E.g., Independent Federation of Flight Attendants v. Trans World Airlines*, 655 F.2d 155, 158 (8th Cir.1981) (dispute minor if agreement "reasonably susceptible" to interpretation advanced); *REA Express, Inc. v. Brotherhood of Railway, Airline, and Steamship Clerks*, 459 F.2d 226, 231 (5th Cir.) ("arguable basis"), *cert. denied*, 409 U.S. 892, 93 S.Ct. 115, 34 L.Ed.2d 149 (1972); *Brotherhood of Locomotive Engineers v. Burlington Northern Railroad Co.*, 838 F.2d 1087, 1091 (9th Cir.1988) ("arguably justified"), *petition for cert. filed*, 56 U.S.L.W. 3720 (U.S. Apr. 1, 1988) (No. 87–1631).

The First and Third Circuits have adopted the "obviously insubstantial" test of this Circuit. *See United Transportation Union v. Penn Central Transportation Co.*, 505 F.2d 542, 544 (3d Cir. 1974); *Airlines Stewards & Stewardesses Association v. Caribbean Atlantic Airlines*, 412 F.2d 289, 291 (1st Cir.1969). The Seventh Circuit uses the "obviously insubstantial" test and also asks whether the claim of contractual justification is "frivolous." *See Atchison, Topeka & Santa Fe Railway Co. v. United Transportation Union*, 734 F.2d 317, 321 (7th Cir.1984).

The Sixth Circuit uses both the "arguably justified" and "obviously insubstantial" standards.

the burden on the party proposing the change is relatively light. When in doubt, courts generally construe disputes as minor, as such a finding is less likely to result in disruption of commerce.

In this instance, the Court must determine whether the new practice of drug testing is arguably predicated on the agreement between the unions and Amtrak, including implied terms. To find that the agreement arguably justifies drug testing, the Court must determine "that it is plausible to believe that there was in fact a meeting of the parties' minds on the general issue." *Railway Labor Executives' Association v. Consolidated Rail Corp.*, 845 F.2d 1187, 1193 (3d Cir.1988).

Stripped to its essentials, Amtrak's argument is that the established past practices involving medical fitness for duty standards, physical examinations, and enforcement of rules against alcohol and drug use on the job arguably justify the new practice of drug testing during physical examinations and based on reasonable suspicion. The Court, however, finds it implausible to believe, based on the unions' acquiescence in the established past practices, that there was a meeting of the minds on the general issue of drug testing.

The Court notes that the circuits have split when similar issues have been presented under the Railway Labor Act. *Compare Railway Labor Executives' Association v. Norfolk & Western Railway Co.*, 833 F.2d 700 (7th Cir.1987) (addition of drug testing to all physical examinations constitutes minor dispute) *and Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington Northern Railroad Co.*, 802 F.2d 1016 (8th Cir.1986) (introduction of post-accident and return-to-work drug testing minor dispute) *with Railway Labor Executives' Association v. Consolidated Rail Corp.*, 845 F.2d 1187 (3d Cir.1988) (addition of drug testing to all physical examinations major dispute); *International Brotherhood of Teamsters v. Southwest Airlines*, 842 F.2d 794 (5th Cir. 1988) (introduction of post-accident and reasonable suspicion drug testing major dispute); *and Brotherhood of Locomotive Engineers v. Burlington Northern Railroad Co.*, 838 F.2d 1087 (9th Cir.1988) (introduction of post-accident drug testing major dispute), *petition for cert. filed*, 56 U.S.L.W. 3720 (U.S. Apr. 1, 1988) (No. 87–1631). While the decisions are enlightening, the Court is mindful that each is grounded on factual determinations of the scope of the agreement between the parties, and are not dispositive of the issues framed by this case.

Clearly, however, some courts have found mandatory drug testing to be arguably justified as a refinement of either the practice of subjecting employees to medical examinations or the practice of enforcing the rule against alcohol or drug impairment. Other courts have reached contrary conclusions. In this regard, the Court finds the views of Rosemary Collyer, General Counsel of the National Labor Relations Board, quite helpful. Collyer has stated unequivocally that mandatory drug testing constitutes a "substantial change in working conditions" even where there is an existing program of mandatory physical examinations and even where established work rules preclude the use or possession of drugs on the job.

In cases where an employer has an existing program of mandatory physical examinations for employees or applicants, an issue arises as to whether the addition of drug testing constitutes a substantial change in the employees' terms and conditions of employment. In general, we conclude that it does constitute such a change. When conjoined with discipline, up to and including discharge, for refusing to submit to the test or for testing positive, the addition of a drug test substantially changes the nature and fundamental purpose of the existing physical examination. Generally, a physical examination is designed to test physical fitness to perform the work. A drug test is designed to determine whether an employee or applicant *uses* drugs, irrespective of whether such usage interferes with the ability to perform

*See Local 1477 United Transportation Union v.* *Baker,* 482 F.2d 228, 230 (6th Cir.1973).

work. In addition, it is our view that a drug test is not simply a work rule—rather, it is a means of policing and enforcing compliance with a rule. There is a critical distinction between a rule against drug usage and the methodology used to determine whether the rule is being broken. Moreover, a drug test is intrinsically different from other means of enforcing legitimate work rules in the degree to which it may be found to intrude into the privacy of the employee being tested or raise questions of test procedures, confidentiality, laboratory integrity, etc. The implementation of such a test, therefore, is a "material, substantial, and ... significant change in [an employer's] rules and practices ... which vitally affect[s] employee tenure and conditions of employment generally."

NLRB General Counsel's Guideline Memorandum Concerning Drug or Alcohol Testing of Employees, Memorandum GC 87–5, at 6 (Sept. 8, 1987), *reprinted in* Daily Labor Report No. 184, at D–1, D–2 (Sept. 24, 1987).

▆▆▆ The Court agrees with the learned General Counsel for the NLRB that the addition of drug testing to physical examinations is a substantial change in working conditions. The railroad unions' acquiescence in physical examinations, even those including urinalysis, cannot even arguably justify a conclusion that there was a meeting of the parties' minds on the general issue of drug testing. Addition of drug testing to physical examinations is a significant departure from past practice and a substantial change in the terms of the agreement. This plainly is not a dispute in the nature of a grievance relating "either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted

case." *Elgin, Joliet & Eastern Railway Co. v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945). Rather, it is an attempt to "change the terms" of an agreement. *Id.*

▆▆▆ Nor is mandatory drug testing based on reasonable suspicion a mere refinement of long-standing methods used to enforce Rule G. The Court finds that the primary method of enforcing the rule against alcohol or drug use on the job was by supervisory observation. Supervisors acted only when they observed objective signs of drug or alcohol use such as slurred speech, staggering gait, bloodshot eyes, sudden changes in personality, or increased absenteeism. Drug testing is intrinsically and significantly different from supervisory observation; it is more intrusive, it reveals information about the off-duty conduct of employees, and it raises a host of concerns about accuracy and reliability, interpretation of the test results, confidentiality, and so forth.[9] The Court is unable to conclude that the unions' acquiescence in the past practice of Rule G and its enforcement by sensory observation arguably justifies drug testing.[10] Amtrak's program is a dramatic departure from past practice, where drug testing was conducted during physical examinations only when, in the judgment of the examining physician, the employee may have been using drugs. The current program, imposed unilaterally by the railroad, encompasses testing in circumstances where there is no suspicion whatsoever.

### Conclusion

This case does not deal with the legality of private employers' requiring a drug test as a condition of employment, or the constitutionality or propriety of drug testing gen-

---

**9.** It is significant that when conducted by government, urinalysis drug testing is a search and seizure within the meaning of the Fourth Amendment. *E.g., National Federation of Federal Employees v. Weinberger*, 818 F.2d 935, 942 (D.C.Cir.1987). Observation by supervisors, of course, does not constitute a search or seizure.

**10.** The General Counsel of the NLRB reached a similar conclusion. "[A] union's acquiescence

in a past practice of requiring applicants and/or current employees to submit to physical examinations that did not include drug testing, or in a rule prohibiting the use or possession of drugs on company premises, does not constitute a waiver of the union's right to bargain over drug testing." NLRB General Counsel's Guideline Memorandum at 9, *reprinted in* Daily Labor Report No. 184, at D–2.

**1524**

erally. "It deals only with the rights of a collective bargaining representative to participate in the formulation of a mandatory drug testing program, to negotiate over the shape that program will take." *International Brotherhood of Teamsters v. Southwest Airlines Co.*, 842 F.2d 794, 799 (5th Cir.1988). "The determinative factors are not whether drugs are dangerous, or whether drug testing is intrusive, but whether the program of mandatory testing and punishment chosen by [the carrier] is consistent with the collective bargaining agreement...." *Id.* Railroads other than Amtrak have been ordered by the courts to resolve these issues by reference to established principles under the Railway Labor Act; in at least one instance railroad and union have negotiated in good faith and reached agreement on a drug and alcohol policy. *See* Agreement Between CSX Transportation, Inc., and the Chesapeake and Ohio Railway Company and Its Employees Represented by United Transportation Union (Aug. 6, 1987), Exh. 4 to Plaintiffs' Reply to Defendant's Motion for Summary Judgment.

In summary, both justifications proffered by Amtrak for its drug testing are "so obviously insubstantial as to warrant the inference that [they are] raised with intent to circumvent the procedures prescribed by § 6 for alteration of existing agreements." *Southern Railway Co. v. Brotherhood of Locomotive Firemen & Enginemen*, 384 F.2d 323, 327 (D.C.Cir. 1967).

■ The imposition of drug testing gives rise to a major dispute entitling the unions to an injunction maintaining the status quo while they bargain with Amtrak over the issue.[11] An appropriate Order accompanies this Memorandum Opinion.

11. Count III of the unions' complaint alleges a violation of the Fourth Amendment. Plaintiffs have failed to show for purposes of this lawsuit that Amtrak is a federal actor whose actions are subject to constitutional scrutiny. They claim Amtrak is a governmental enterprise because it was created by Congress and relies heavily on federal funds. This argument has been uniformly rejected by federal courts and this Court concurs in their analysis. *See, e.g., National Railroad Passenger Corp. v. Two Parcels of*

**ORDER**

For the reasons set forth in the accompany Memorandum Opinion, it is this 3rd day of August, 1988,

ORDERED that plaintiffs' motion for summary judgment is granted; and it is

FURTHER ORDERED that defendant's motion for summary judgment is denied; and it is

FURTHER ORDERED that defendant is enjoined, pursuant to 45 U.S.C. § 156, from implementing, with respect to Amtrak employees represented by the plaintiffs, its policy of requiring urinalysis drug and alcohol testing, pending exhaustion of the procedures set forth in the Railway Labor Act, 45 U.S.C. § 156. This injunction shall not apply to toxicological testing mandated by federal law or regulation.

*Land*, 822 F.2d 1261, 1264 (2d Cir.), *cert. denied*, — U.S. ——, 108 S.Ct. 347, 98 L.Ed.2d 373 (1987); *Anderson v. National Railroad Passenger Corp.*, 754 F.2d 202, 204 (7th Cir.1984); *Hankin v. National Railroad Passenger Corp.*, No. 86 C 7233, slip op. at 6 (N.D.Ill. Nov. 9, 1987); *Kimbrough v. National Railroad Passenger Corp.*, 549 F.Supp. 169, 172–73 (M.D.Ala.1982); *Moorhead v. National Railroad Passenger Corp.*, No. 81–1579, slip op. at 3–4 (D.D.C. Mar. 9, 1982).