INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS; International Association Of Machinists And Aerospace Workers District Lodge 141–M, Plaintiffs,

v.

US AIRWAYS, INC., Defendant.

Civil Action No. 03–1496.

United States District Court,
W.D. Pennsylvania.

Oct. 21, 2003.

Robert A. Bush, Ira L. Gottlieb, Taylor, Roth, Bush & Geffner, Burbank, CA, Michael J. Healey, Healey & Hornack Law & Finance Building, Pittsburgh, PA, David Neigus, Upper Marlboro, MD, for plaintiff.

Thomas A. Jerman, Rachel A. Shapiro, Aparna B. Joshi, O'Melveny & Meyers, Washington, DC, Sidney Zonn, Littler Mendelson, Pittsburgh, PA, for defendant.

## *MEMORANDUM ORDER*

CINDRICH, District Judge.

This action arises from a labor dispute between plaintiffs International Association of Machinists and Aerospace Workers and International Association of Machinists and Aerospace Workers District Lodge 141–M (collectively referred to as the "IAM") and defendant US Airways, Inc. ("US Air") regarding US Air's plan to subcontract out heavy maintenance work on certain aircraft which the IAM claims is strictly prohibited by the parties' collective bargaining agreement ("CBA"). The IAM

filed the instant complaint seeking injunctive relief, declaratory judgment, and damages and simultaneously filed a motion for a temporary restraining order ("TRO") (Doc. No. 2) seeking immediate injunctive relief. The IAM subsequently filed a motion for preliminary injunction (Doc. No. 14) seeking essentially the same injunctive relief sought in the motion for TRO. The court held a hearing on the IAM's motion for TRO on October 10, 2003. The parties did not present live testimony or other evidence at the hearing but agreed instead to rely on affidavits and documents already filed. The parties also agreed that the court should consider the hearing as a final hearing on the motion for preliminary injunction which is now ripe for decision.

## I. *Background*

Unless otherwise noted, the following background facts are not in dispute. The IAM and US Air have been parties to a series of CBAs regulated by the Railway Labor Act ("RLA"), 45 U.S.C. Sections 151 *et seq.* The current CBA is dated October 1995 with an amendable date of December 31, 2008. Article 2 of the CBA, titled "Scope of Agreement," provides at section (B) that employees of US Air represented by the IAM shall perform all of the following work, "wherever performed":

the making, assembling, erecting, dismantling, and repairing of all machinery, mechanical equipment, engines and motors of all description, including all work involved in dismantling, overhauling, repairing, fabricating, assembling, welding, and erecting all parts of airplanes, airplane engines, avionics equipment, electrical system, heating system, hydraulic system, and machine tool work in connection therewith, including all maintenance, construction and inspection work in and around all shops, hangers, buildings, and including the servicing, cleaning and polishing of airplanes and parts thereof, and the servicing and handling of all ground equipment performed in and about Company shops, Maintenance bases, Aircraft Base Maintenance bases, and Line Service stations.

CBA at Aff. of E. Allen Hemenway (Doc. No. 10) Ex. 1 (hereinafter cited as "CBA") p. 6.

The CBA also contains a "Letter of Clarification" of Article 2(B) (referred to hereinafter as the "First Clarification") which provides as follows:

(A) As a clarification of Article 2 (Scope of Agreement) of the Agreement between [US Air] and the [IAM], it is agreed that:

1. Section (B) of said Article 2 is recognized by both parties as prohibiting the "farming out" of the types of work specified in said Section (B).

2. The intent of said Section (B) is that the types of work specified therein (and in Article 4 of the aforementioned Agreement) shall be accomplished by the employees of [US Air], described in the said Article 4.

3. The preceding clarification shall apply to the aforementioned Agreement, and any and all supplements thereto or modifications thereof reached under the [RLA], as amended, and shall be and remain in effect until modified by mutual agreement or until a contradictory renegotiated Article 2 of the aforementioned Agreement is made effective, whichever occurs first.

CBA at p. 99.

The only exceptions to the prohibition on "farming out" any work covered by Article 2(B) are listed in another clarification titled "Clarification of Article 2(B)" (referred to hereinafter as the "Second Clari-

fication") which provides in relevant part that "[i]t is not the Company's intent to perform scheduled maintenance at locations other than US Airways maintenance bases", and that the Company may have work performed by non-employees only in specifically described circumstances. One type of work listed as an exception to the subcontracting prohibition is described at section (G) of the Second Clarification, which states:

> Types of work customarily contracted out, such as parts and material which the Company could not be expected to manufacture, such as engine and airframe parts, castings, cowlings, seats, wheels and other items which are commonly manufactured as standard items for the trade by vendors. Work subcontracted out to a vendor will be of the type that cannot be manufactured or repaired in-house by existing skills/equipment or facilities of the Company.

CBA at p. 101.

US Air purchased several Airbus aircraft in 1998 to add to its fleet of Boeing aircraft. Under US Air's FAA-mandated maintenance program, US Air must perform what is called an "S Check" on the Airbus aircraft every five years. An S–Check is considered heavy maintenance work as it involves extensive disassembling of the aircraft for a detailed inspection and the making of any necessary repairs. An S–Check takes approximately fourteen days, during which time the aircraft will be out of service.

Although IAM-represented employees of US Air have never performed an S–Check before, there is no dispute that they are trained and fully qualified to perform such work. These employees have always performed the same type of heavy maintenance work on the company's Boeing aircraft. Moreover, IAM-represented employees have performed all required maintenance of the Airbus fleet to date, including less involved A, B, and C–Checks. The quality of the work on S–Checks is no different than previously performed C–Checks; there is simply more exposing of the physical skeleton of the aircraft for inspection. Essentially all of the tooling and equipment necessary to perform S–Checks is the same as that required to perform C–Checks.

The parties submitted conflicting affidavits and declarations as to the adequacy of the current facilities and tooling to perform S–Checks and keep up with all other required maintenance work. The IAM contends that existing facilities and tools are adequate whereas US Air claims they are not. Ten Airbus aircraft are due for S–Checks between October 2003 and January 2004. After the first ten are completed, another seven Airbus aircraft will be due for an S Check beginning in September 2004. In January 2005, US Air must begin to perform S–Checks on its Airbus fleet on an ongoing basis.

Since the beginning of the parties' collective bargaining relationship in 1949, US Air has never subcontracted this type of heavy maintenance work on any aircraft equipment in its fleet. Indeed, in collective bargaining negotiations between the IAM and US Air in 1999, US Air recognized that it did not have the right to subcontract airframe heavy maintenance work. During those negotiations, U.S. Air sought to obtain that subcontracting right from the IAM by proposing that it be allowed to contract out heavy maintenance work, like the S Check, on its Boeing aircraft then in need of such service. The IAM rejected that proposal.

In the Spring of 2003, US Air indicated to the IAM that it was considering whether to subcontract the S–Checks on its Airbus fleet. The IAM responded to US Air on August 4, 2003, indicating that

any attempt to subcontract such work would be a violation of the CBA and constitute a "major dispute" under the RLA. US Air responded in turn on August 8, 2003 indicating that the dispute was a "minor dispute" under the RLA because the disagreement involved a dispute over the interpretation of Article 2 (Scope Clause) of the CBA and therefore required the issue to be arbitrated in accordance with the RLA. US Air did not offer any interpretation of Article 2, however, and further indicated that it had not decided how the upcoming S–Checks would be handled. The IAM subsequently refused to submit the dispute to arbitration.

On October 6, 2003, US Air advised the IAM that it was contracting out the first ten Airbus aircraft S–Checks to Singapore Technologies Mobile Aerospace Engineering in Mobile, Alabama. US Air also stated that certain IAM-represented employees would be sent to Alabama to train the subcontractor's employees in U.S. Air's practices and procedures for performing heavy maintenance work on the Airbus, including gaining familiarity with the Airbus maintenance manual and related FAA guidelines. Two additional IAM-represented employees would be sent to Alabama to perform quality assurance work in connection with the subcontracting. The IAM responded by filing the instant complaint seeking a temporary, preliminary and permanent injunction directing US Air to cease and desist the subcontracting of airframe heavy maintenance work on the Airbus fleet and all other heavy maintenance work covered by the CBA.

## II. *Analysis*

■ A threshold issue the court must decide is whether the parties' dispute is a "major" or "minor" dispute under the RLA. As we explain below, the court is without subject matter jurisdiction to adjudicate a minor dispute, in which case the parties' remedies are exclusively limited to the RLA. In a major dispute, however, the court retains jurisdiction over the case and has the power to preserve the status quo as required by the RLA, without the customary consideration of irreparable harm. Thus, even though a motion for preliminary injunction is what is currently before the court, it appears that the factors customarily considered in deciding such a motion, i.e., likelihood of success on the merits, relative harm, and the public interest, are not relevant to the determination of this threshold jurisdictional issue. Indeed, if the court determines that the dispute is a major one, these customary factors are inconsequential to the decision of whether to issue a status quo injunction.[1] Moreover, neither party cites any case where the court weighed the customary preliminary injunction factors when making a major/minor dispute determination or issuing a status quo injunction in the case of a major dispute. Still, both parties have addressed these factors and we will consider them to ensure that all potential issues are fully developed for appeal.

### A. *Major or Minor Dispute*

■ As US Air correctly sets forth in its brief, this action is governed by the RLA, the principle purpose of which is to avoid interruptions to commerce. *See Detroit & T.S.L. Ry. v. United Transp. Un-*

---

1. *See Railway Labor Executives' Ass'n v. National R.R. Passenger Corp.,* 691 F.Supp. 1516, 1521 (D.D.C.1988):

   The question of whether a dispute is major or minor determines the extent to which a federal court may become involved. If the dispute is major, the courts have broad powers to enjoin unilateral action by either side to preserve the status quo while statutory settlement procedures go forward. Such an injunction may issue without regard to the usual balancing of the equities.

*ion,* 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969). To achieve that end, the RLA provides that air carriers and their employees are obligated "to exert every reasonable effort to make and maintain agreements ... and to settle all disputes, whether arising out of the application of such agreement or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." 45 U.S.C. Section 152, First.

The role of the federal courts in enforcing this obligation turns on whether the dispute is characterized as a "major" or "minor" dispute. Simply put, the court is without authority to issue an injunction or otherwise adjudicate a "minor" dispute and the parties' remedies are exclusively as provided in the RLA. Not so, however, in a "major dispute", where the court has the power to preserve the status quo as required by the RLA.

■ A major dispute is one that involves efforts to make new CBAs or to modify existing ones. *Elgin, J. & E.R. Co. v. Burley,* 325 U.S. 711, 722–723, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945).[2] For major disputes, the RLA sets forth a detailed negotiation and mediation process to resolve such conflicts between the carrier and the union. *See* 45 U.S.C. Sections 155 and 156. Although the parties are ultimately free to exercise self-help, they must maintain the "status quo" until the negotiation and mediation procedures are exhausted. *Detroit & T.S.L. Ry.,* 396 U.S. at 150, 90 S.Ct. 294. In a major dispute, the

status quo requirement both prevents the union from striking and management from changing the rates of pay, rules or working conditions related to the dispute. *Id.* at 153, 90 S.Ct. 294. "The district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures, without the customary showing of irreparable injury." *Consolidated Rail Corp. v. Railway Labor Executives' Assoc.,* 491 U.S. 299, 303, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989) (referred to hereinafter as *"Conrail"*) (citation omitted).

■ Minor disputes, in contrast, are those which concern grievances or matters, the resolution of which require the interpretation or application of existing CBAs. *Elgin,* 325 U.S. at 722–23, 65 S.Ct. 1282. For minor disputes, the RLA requires the parties to submit the contract interpretation or application issue to the appropriate adjustment board for final and binding arbitration. 45 U.S.C. Section 153. The appropriate adjustment board has exclusive jurisdiction over minor disputes. *Conrail,* 491 U.S. at 304, 109 S.Ct. 2477. As to any status quo obligation, the Supreme Court has never recognized a general statutory obligation on the part of an employer to maintain the status quo pending the adjustment board's decision on a minor dispute. *Id.*

The Supreme Court set forth the controlling standard for distinguishing between a major and minor dispute in *Conrail,* wherein the Court held that when an employer asserts a contractual right to take a contested action, "the ensuing dis-

---

**2.** The terms "major" and "minor" are not found within the RLA. The Supreme Court first used the major/minor typology in the *Burley* decision. In doing so, the Court adopted the nomenclature that had developed within the railroad industry. *See* 325 U.S. at 723–28, 65 S.Ct. 1282. As the Court later clarified in *Consolidated Rail Corp. v. Railway*

*Labor Executives' Ass'n,* 491 U.S. 299, 305, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989), the designations "major" and "minor" are not to be understood as reflecting the relative importance of particular labor controversies.

*Independent Assoc. of Continental Pilots v. Continental Airlines,* 155 F.3d 685, 690 n. 4 (3d Cir.1998).

pute is minor if the action is arguably justified by the terms of the parties' collective bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major." *Id.* at 307, 109 S.Ct. 2477. The asserted contractual right does not, however, have to be based on an express provision of the CBA. The Court made it clear that both express and implied provisions of a CBA, based on practice, usage and custom, may be considered when deciding whether an employer's action is arguably justified. *Id.* at 311, 109 S.Ct. 2477; *General Comm. of Adjustment, United Transp. Union, W. Md. Ry. Co. v. CSX R.R. Corp.,* 893 F.2d 584, 591 (3d Cir.1990) ("It is a well-established rule that the parties' 'practice, usage and custom' is very significant in interpreting the agreement, especially as it demonstrates a mutual understanding between the parties on a particular issue." (citing *Conrail,* 491 U.S. at 311, 109 S.Ct. 2477)). The Court also commented that "the formal demarcation between major and minor disputes does not turn on a case-by-case determination of the importance of the issue presented or the likelihood that it would prompt the exercise of economic self-help." *Id.* at 305, 109 S.Ct. 2477. The Court further noted that the employer's burden in establishing that a dispute is minor is a light one. *Id.* at 307, 109 S.Ct. 2477; *see United Transp. Union,* 893 F.2d at 591 ("[I]n close cases, disputes are characterized as 'minor.'")

In *Conrail,* the railroad did not rely on any express provision of the parties' CBA to justify the disputed action-an increase in the incidents of employee drug testing. Conrail cited instead the parties' practice, usage and custom. The Court did not further define the terms "arguably justified," "frivolous" or "obviously insubstantial." The Court considered instead the strengths of the parties' arguments and ultimately concluded that Conrail had met its burden of establishing that "its drug-testing practice is arguably justified by the implied terms of its collective-bargaining agreement" based on a long-standing practice of the railroad having a general breadth of freedom in connection with drug testing. 491 U.S. at 320, 109 S.Ct. 2477.

In the instant case, US Air does not argue that there is any implied right, based on past practices or custom, to subcontract S–Checks. Indeed, no implied right argument could be made as such heavy maintenance work has never been subcontracted during the parties' entire 54 year collective bargaining relationship. Instead, US Air relies solely on the last sentence of section (G) of the Second Clarification as the basis for such authority. We find that US Air's position is not arguably justified.

Article 2 of the CBA is extremely broad and comprehensive in its coverage of work that must be performed by IAM-represented employees and clearly includes S–Checks. The First Clarification further highlights that subcontracting work covered by Article 2, which includes S–Checks, is strictly prohibited. US Air claims that an exception to this clear and unequivocal prohibition can be found in the last sentence of section (G). As previously noted, section (G) of the Second Clarification provides an exception to Article 2's coverage for "[t]ypes of work **customarily contracted out** ... which are commonly manufactured as standard items for the trade by vendors." (emphasis added). The second, and last, sentence of section (G) states "[w]ork subcontracted out to a vendor will be **of the type** that cannot be manufactured or repaired in-house by existing skills/equipment or facilities of the Company." (emphasis added). This last sentence can only be read as a clarification of the first sentence—that only types of work customarily contracted out to vendors is an exception to the prohibition on

subcontracting set forth in Article 2. We reach that conclusion with some confidence based on the following, undisputed facts:

(1) the longstanding and uninterrupted practice and custom that heavy maintenance types of work such as an S Check has always been performed by IAM-represented employees;[3]

(2) the fact that such work has always been considered within the exclusive province of those employees under the CBA as evidenced by the aforementioned history of the parties' actions under the CBA; and

(3) the fact that US Air recognized through bargaining conduct as late as 1999 that it had no right to subcontract such work, even though section (G) had been part of the CBA for many years. Indeed, there can be no argument that heavy maintenance work like the S Check has been customarily contracted out to vendors because there are no facts to support such an argument.

US Air's parsing out of this last sentence of section (G) for the proposition that it is to be read as a stand-alone provision which allows the company to contract out any work where there is a dispute as to whether there are adequate facilities or tools to perform such work is not arguably justified. Indeed, US Air could unilaterally void the entire CBA based on such interpretation simply by not providing IAM-represented employees with adequate facilities or tools to perform their work.[4] Thus, US Air has not met its burden, as light as that burden is, of establishing a minor dispute. US Air's attempts to contract out S–Checks on its Airbus fleet is not arguably justified by the CBA, particularly not by US Air's out of context reliance on the last sentence of section (G) of the Second Clarification which claim we find to be obviously insubstantial. Under the guise of a claimed dispute about the meaning of language in the CBA, U.S. Air is attempting to remake or amend the most elemental and consequential provisions of the CBA. We find, therefore, that the instant dispute constitutes a major dispute under the RLA.[5]

### B. Relative Harm and Public Interest

■ Upon consideration of the verified complaint, affidavits and declarations sub-

---

**3.** Based on this long-standing and only practice, *Conrail* actually supports the IAM's argument that US Air's actions constitute an attempt to modify the CBA and therefore constitutes a major dispute.

**4.** The parties' dispute as to whether there are existing facilities and tools to adequately perform S–Checks is not relevant to the determination of whether this case involves a major or minor dispute. We note, however, that the evidence of record on the matter highlights another hole in US Air's position. The sentence US Air relies on states that work subcontracted out to a vendor will be of a type that "cannot" be manufactured or repaired in-house. Although the parties' respective affidavits and declarations conflict as to the adequacy of US Air's facilities and tooling to perform S–Checks along with all other maintenance obligations in the most optimal way, we do not gather from US Air's affidavits that S–Checks could not be performed with existing facilities and tools. The evidence indicates instead that at worst the S–Checks can be performed with existing facilities and tooling, just not in the most timely and cost efficient way.

**5.** The determination of whether the dispute is major or minor is a question of law in this case and the parties have apparently submitted everything they deem necessary for the court to make such determination. Neither side has indicated that any additional information is needed for the court to make a final decision on the matter. Thus, we are prepared and intend to issue a final, not preliminary, ruling on this jurisdictional issue. As previously noted, however, we will consider the customary preliminary injunction factors, one of which is likelihood of success on the merits. This factor is established, given our finding that this is a major dispute.

mitted in the case, we find that immediate, substantial and irreparable damages, injury or loss will result to the IAM and the employees it represents before a hearing on the request for a permanent injunction can be had. If the subcontracting activity violative of maintaining the status quo of IAM-represented employees performing heavy maintenance work, particularly S–Checks and US Air's Airbus fleet, is continued, the IAM and the employees they represent will suffer job displacement and attendant incalculable loss of income and imposition of economic and other hardship upon themselves and their families and dependants, and the IAM will suffer loss of goodwill attendant to such losses suffered by the employees. Further, the subcontracting in question will inflict needless, substantial and irreparable economic harm upon the general public, particularly in those areas surrounding US Air's hub in Pittsburgh, Pennsylvania and Charlotte, North Carolina, by withdrawing substantial economic activity and commerce from those areas. We note that we are not impressed with US Air's conclusory assertion that the public will be substantially harmed by the potential of cancelled flights. Also, if the preliminary injunction is issued, the injury, if any, to US Air, if a final judgment is granted in its favor, will be inconsequential when compared with the loss of hardship which the IAM, the employees they represent and the public will suffer if the order is not issued. Moreover, any such injury suffered by US Air will be adequately indemnified by a nominal bond.

For the foregoing reasons, **IT IS HEREBY ORDERED** that plaintiffs' motion for TRO (Doc. No. 3) is **DENIED AS MOOT** and plaintiffs' motion for a preliminary injunction (Doc. No. 14) is **GRANTED.** An appropriate order granting injunctive relief will be entered.

### *PRELIMINARY INJUNCTION*

**IT IS HEREBY ORDERED** that a Preliminary Injunction is issued against Defendant, US Airways, Inc., and its officers, agents, representatives, employees, subsidiaries, and all other entities controlled by or acting in concert with, through or under US Airways, Inc., or by and through its orders, and each of them are restrained, enjoined and ordered to cease and desist any and all efforts, including communications, contracting or fulfilling or carrying out the terms of a contract, training, and/or negotiations, and/or physical actions, including the movement of aircraft, intended to result, or tending or reasonably likely to result, in the subcontracting of Airbus A319/320/321 airframe heavy maintenance work, or any other type of maintenance work currently being performed by the Company with employees covered by the parties' collective bargaining agreement in violation of the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*

This Preliminary Injunction is issued on the condition that a bond be filed by Plaintiffs herein on or before October 25, 2003, in the sum of $10,000.00 and that Defendant shall recover from the Plaintiffs under said bonds all costs and damages, if any, suffered by them in the event that Plaintiffs do not succeed in this action.